UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-mj-3370

| | |
|---|---|
| IN RE CRIMINAL COMPLAINT FOR EDUIN SAMUEL DURAN COLINA AND CLAUDIO FRANCISCO TAVERA ESPINAL | **Filed Under Seal** |

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?     _ Yes  X No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  __ Yes  X No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?     _ Yes  X No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: *Joseph M. Schuster*
Joseph M. Schuster
Assistant United States Attorney
Court ID No. A5502182
99 NE 4th Street
Miami, FL 33132
Tel: (305) 961 9336
Fax: (305) 530-7976
joseph.schuster@usdoj.gov

AO 91 (Rev 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| EDUIN SAMUEL DURAN COLINA and | ) Case No. 20-mj-3370 |
| CLAUDIO FRANCISCO TAVERA ESPINAL, | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __January 2018 to the present__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida and elsewhere__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. §§ 959(a), 963 | Conspiracy to distribute more than five (5) kilograms of cocaine, knowing, intending, and having reasonable cause to believe that the cocaine would be unlawfully imported into the United States. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

Robert W. Lukens, DEA Sepcial Agent
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time

Date: __August 13, 2020__

*Judge's signature*

City and state: __Miami, Florida__    U.S. MAGISTRATE JUDGE CHRIS M. McALILEY
*Printed name and title*

## AFFIDAVIT

I, Robert W. Lukens, a Special Agent with the U.S. Drug Enforcement Administration ("DEA"), being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the DEA Miami Field Division Office. I have been a Special Agent with the DEA for approximately sixteen (16) years. Prior to joining the DEA, I served as a Border Patrol Agent with United States Border Patrol for approximately two (2) years.

2. As a DEA Special Agent, I have received training in specialized controlled substances investigative matters including, but not limited to, drug interdiction, drug detection, money laundering techniques, locating hidden assets derived from drug trafficking, and the investigation of individuals involved in smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances. I have participated in numerous narcotics investigations involving physical and electronic surveillance; the interception and analysis of wire and oral communications; execution of search and arrest warrants; evidence handling; undercover operations; the control and administration of confidential sources; international drug importations; and domestic drug distribution organizations. I have participated in the arrest and subsequent prosecution of numerous drug traffickers. I have spoken on numerous occasions with informants, suspects, and experienced narcotics investigators concerning the manner, means, and practices that drug traffickers use to further the operation of their drug trafficking organizations and the most effective methods of investigating and dismantling drug trafficking organizations. Based on my training, personal experience, and participation in criminal investigations, I have become familiar with the methods and techniques used by individuals engaged in drug trafficking, including the support and assistance that drug trafficking organizations require to conduct their illegal activities.

3. I submit this affidavit in support of a criminal complaint charging that between in or around January 2018 through the date of this Affidavit, Eduin Samuel DURAN COLINA, a/k/a

"Oscar Claro Barros-Martinez," "Edwin," "Claro," "Tio," and "Orejon," ("DURAN") and Claudio Francisco TAVERA Espinal, a/k/a "Taveras" ("TAVERA") did knowingly and willfully combine, conspire, confederate, and agree with each other and other persons known and unknown, to distribute a controlled substance in Schedule II, intending, knowing, and having reasonable cause to believe that such controlled substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959(a), all in violation of Title 21, United States Code, Section 963, and that the controlled substance involved in the conspiracy attributable to them as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable to them, is five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(B).

4. The statements contained in this affidavit are based on my personal knowledge, as well as information relayed to me by other law enforcement officials involved in this investigation, interviews of witnesses and co-conspirators, and information obtained from reports and examinations of seized evidence. I have not included in this affidavit each and every fact known to me. Rather, I have included only the facts that are sufficient to establish probable cause for the issuance of a criminal complaint against DURAN and TAVERA for violating Title 21, United States Code, Sections 959(a) and 963.

### Background

5. Based on the investigation of this case, as discussed in detail below, DURAN is the leader of a drug trafficking organization (the "DURAN DTO") that operates in the La Guajira region in northeastern Colombia. The DURAN DTO sends multi-hundred kilogram shipments of cocaine from the La Guajira region, through transshipment points in the Caribbean, primarily the Dominican Republic, for ultimate unlawful importation into the United States. The DURAN DTO also sends

2

large shipments of cocaine to Europe. The DURAN DTO primarily uses "go-fast vessels" and airplanes to transport cocaine from Colombia to the Dominican Republic.

6. On or about December 5, 2012, authorities arrested DURAN in the Dominican Republic on a warrant from the Southern District of New York (under one of his aliases, "Oscar Claro Barros-Martinez") (fingerprint comparison confirms that "Oscar Claro Barros-Martinez" is DURAN). DURAN was then extradited to the United States. After DURAN arrived in New York, DEA agents interviewed him. The agents read DURAN his *Miranda* rights in Spanish and DURAN signed a form (also in Spanish) stating that he understood his right and voluntarily agreed to waive them. DURAN did not speak English at the time. During his post-*Miranda* interview, DURAN told investigating agents that he was involved in arranging loads of cocaine that were smuggled from the Dominican Republic to Puerto Rico. DURAN told investigators that he remembered three (3) vessels that smuggled between 150 to 200 kilograms of cocaine from the Dominican Republic hidden in the vessels' hulls and rudders. DURAN told investigators that on two (2) occasions he personally invested at least five (5) kilograms of cocaine on these vessels. DURAN then later pled guilty to money laundering violations in the Southern District of New York and was sentenced to prison.

7. Based on the investigation of this case, as discussed in detail below, TAVERA works as a logistics coordinator for the DURAN DTO and works closely with DURAN. In or around 2012, law enforcement arrested TAVERA for conspiracy to distribute cocaine and Hobbs Act robbery in the Southern District of New York. TAVERA was convicted and sentenced to prison.

8. While serving their respective prison sentences, DURAN and TAVERA were cellmates. I have reviewed prison records that confirm that DURAN and TAVERA were cellmates. After the conclusion of their sentences, DURAN and TAVERA were both deported to their home countries. DURAN was deported to Colombia and TAVERA was deported to the Dominican

Republic. TAVERA has a Dominican Republic cedula and bank accounts in the Dominican Republic.

**April 2, 2019 Cocaine Seizure**

9. On or about April 2, 2019, the Colombian National Police ("CNP") seized approximately 312 kilograms of cocaine from a truck in Popayan, Colombia. The cocaine was hidden in a truck with a "cover load" of fruit (pictures attached below). Based on my training and experience, I know that drug smugglers often attempt to conceal their narcotics in shipments of innocuous food or household goods, such as fruit. CNP officers transported the cocaine to a lab where analysts confirmed that a sample was, in fact, cocaine.



10. The CNP opened approximately twenty-five (25) of the cellophane-wrapped kilograms and noted that each of these kilograms had markings stamped into them. Based on my training and experience, I know that drug traffickers often mark their individual kilograms of cocaine to indicate provenance, ownership, quality, purchaser, and/or for additional purposes. Approximately half of the kilograms that the CNP examined were stamped with letters that appeared

4

to read "US" and approximately half of the kilograms were stamped with letters that read "London" (pictures attached below).

 

11. After receiving the pictures of the markings on some of the cocaine seized on April 2, 2019 (attached above), I consulted DEA's "Fountainhead" database. The DEA's Fountainhead database is a collection of photographs and reports of narcotics seizures from around the world, sorted by the labels, stamps, and marking on the drug packaging. The database query revealed that in August 2019, the Dutch Coast Guard seized approximately 800 kilograms of cocaine stamped with "London" into the kilos, in a vessel in the sea to the east of La Guajira, Colombia. The database query also revealed that on or about August 5, 2019, Immigration and Customs Enforcement ("ICE") seized kilograms of cocaine in Texas marked with "London" stamps.[1]

12. Based on my training, experience and knowledge of other investigations, I know that when large quantities of narcotics are transported north from Colombia (such as to a transshipment location such as the Dominican Republic), at least part of the narcotics from those shipments is eventually imported into and sold in the United States. There are two reasons for this. First, the United States is one of the most profitable markets for narcotics in the world (and the most profitable market that is relatively close to South America and countries in the Caribbean, compared to, for example, Europe or Australia) and thus the most likely way for a narcotics trafficker to earn a profit

---

[1] In addition, in or around January 2020, the Spanish Navy seized approximately 1500 kilograms of cocaine with "London" stamps near the Canary Islands.

5

given the expenses of clandestinely transporting such a large load of cocaine north. As the goal is to sell at least some portion of the cocaine for the highest possible price, traffickers can make the most for their investment in the United States (compared to Central America and the Caribbean countries). Second, the United States, which has a much larger population than those of Caribbean and Central American countries, is the only country north of Colombia that would have a demand for narcotics sufficient to absorb such a large quantity of narcotics. My belief that at least part of the narcotics from large shipments that move north from Colombia are imported into the United States is corroborated by evidence showing that markings from kilograms of cocaine seized in Central America and the Caribbean are found on kilograms of cocaine seized in the United States. My belief that this specific load of cocaine seized by the CNP in Popayan was destined, at least in part, for unlawful importation into the United States is also based on ICE's seizure of kilograms of cocaine marked with "London" in the United States, and the markings on the kilograms of cocaine that appear to read "US."

13. Before, during, and after the April 2, 2019, 312-kilogram seizure, pursuant to judicial authorization, the CNP intercepted telephone numbers associated with the DURAN DTO. During the investigation, the CNP intercepted calls between DURAN, TAVERA, and some of their coconspirators, including Coconspirator 1 ("CC-1") and Coconspirator 2 ("CC-2"). Through the course of the investigation, the CNP was able to identify DURAN, TAVERA, CC-1 and CC-2. CNP investigators learned that TAVERA, CC-1, and CC-2 acted as logistical and transportation coordinators for this cocaine smuggling venture (with CC-2 scheduled to assist in driving with the shipment of cocaine in a separate car).

14. On March 9, 2019, law enforcement intercepted DURAN telling CC-1, in essence, not to say anything on the telephone, to which CC-1 replied that he (CC-1) would text DURAN shortly. Based on my training and experience, I know that drug traffickers often use coded language

when speaking on the telephone about their illegal activities in an attempt to avoid divulging sensitive information to law enforcement officers who may be listening, and also to prevent leaving a record of incriminating statements that can be used against them in later prosecutions. Based on my training and experience I also know that drug traffickers often use encrypted applications, such as What's App, to communicate regarding their illegal activities in an attempt to prevent law enforcement from intercepting their communications.

15. On or about March 9, 2019, the CNP intercepted a call between DURAN and CC-1 where DURAN said, "[D]ude we're... we're calling a lot of attention to ourselves... Don't say anything on here... don't say anything on here..."[2] CC-1 then replies, "Yeah, I'll write to you right away, Tio." Based on my investigation in this case, and through discussing the investigation with CNP officers, I know that "Tio" is one of DURAN's aliases. Furthermore, during numerous intercepted calls between CC-1 and DURAN, CC-1 refers to DURAN as "Tio." Also, during numerous intercepted calls between TAVERA and CC-1, they refer to "Tio." During this conversation, DURAN then said, "No, I don't have that phone. I'm already out. I left that phone trashed." Based on my training and experience, I know that drug traffickers often warn each other to refrain from discussing illicit activities while speaking on the telephone, and that they instead use encrypted communication methods, such as What's App, to communicate.

16. Later in the day on March 9, 2019, the CNP intercepted another call between DURAN and CC-1. During the call, DURAN said, "Son, so when are we going to see that guy? Son, we're waiting too long for this." CC-1 replied, "No, well, he told me to take care of... of the delivery we've got now and to bring it over to you, so, wherever you tell us, he said." DURAN then replied, "Yeah, because you know that there's a lot of money up in the air, son, you know?"

---

[2] The communications were in Spanish and the summaries of, or quotations from, these conversations are based on translations of the conversations from Spanish to English.

17. On March 12, 2019, the CNP intercepted a call between DURAN and CC-1. During the call, DURAN said, "How are things? Good? Did you get things started?" CC-1 then responded, "Well, yeah. They're there like, uh, last night they were going to… to go in… they're going in now, but I can't find the… the little pal to see how he… he is stocked. He left to a little town over there, and he told me to wait here for him. I'm here waiting for him, I'll talk to him right now, and later today I'll give you a call, Tio. To see…" After their voices overlap and DURAN said, "All right, then," CC-1 finished his sentence that started, "To see…" with "…how much… how much we've put together." DURAN then immediately told CC-1 to "text [him]." Based on my investigation in this case, and through discussing the investigation with CNP officers, I know that DURAN is asking CC-1 to text him how much cocaine the DTO has put together for the shipment. I also know that DURAN is again asking CC-1 to provide information regarding the amount of cocaine via text rather than discuss illicit activities over the phone.

18. On or about March 23, 2019, the CNP intercepted a call between TAVERA and CC-1 discussing the planned cocaine transport. During the call, CC-1 referenced other conversations that he had with "Tio" related to the transport. During this call, TAVERA and CC-1 discussed the logistics of the transport and conversations with another logistics coordinator ("CC-2") working for them. The next day, on or about March 24, 2019, TAVERA spoke to CC-2 about CC-2's planned meeting with CC-1.

19. On or about March 29, 2019, TAVERA and CC-1 again discussed the logistics of the planned cocaine transport, including working with CC-2. TAVERA asked CC-1, "[H]ow much do you have?" and CC-1 responded, "I've got… like 320… 315, more or less there." TAVERA then confirmed that CC-1 had 315. Based on my investigation of this case, and through discussing the investigation with CNP officers, I know that TAVERA and CC-1 were discussing cocaine when they said "315." As noted above, when law enforcement seized the DURAN DTO's shipment of

cocaine, they recovered approximately 312 kilograms of cocaine. TAVERA and CC-1 also discussed an upcoming meeting with "Tio." TAVERA told CC-1 that he (TAVERA) planned to travel to Popayan. As discussed above, the CNP seized the DURAN DTO's cocaine shipment in Popayan.

20. On March 29, 2019, TAVERA spoke directly to CC-2. During this intercepted call, TAVERA and CC-2 discussed the travel conditions for the "trucks." TAVERA and CC-2 also discussed when CC-2 was going to leave. TAVERA said, "[S]o, one question, you can't leave tonight... early in the morning?" CC-2 replied, "No, because today they are just barely starting to get the products." As discussed above and below, the CNP found the DURAN DTO's cocaine concealed within a shipment of fruit. TAVERA and CC-2 also discussed the logistics involved in TAVERA's potential travel to Popayan. As discussed above and below, the CNP seized the DURAN DTO's cocaine in the city of Popayan.

21. On March 30, 2019, the CNP intercepted another call between TAVERA and CC-2. TAVERA informed CC-2 that he (TAVERA) was in Popayan. CC-2 said, "So, let me tell you that it's still not... they're not going to pick up the fruit to take it from here to there." Later in the conversation, CC-2 said, "[T]hey won't pick up the fruit today, to deliver... So, if... if they start moving today, they'll pick it up today so I can leave tomorrow." After continuing to discuss the logistics of the transport, TAVERA told CC-2, "[E]ither way I want you to receive it," to which CC-2 agreed. Based on my investigation of this case, and through conversations with CNP investigators, I know that "it" means the DURAN DTO's cocaine shipment. They then mentioned CC-1's given name (which matched the CNP's later identification of CC-1). TAVERA and CC-2 then continued to discuss the logistics of the transport and the difficulties that weather and traffic presented.

22. On March 30, 2019, the CNP also intercepted a call between TAVERA and CC-1. During the call, TAVERA asked, "...it's finished?" CC-1 then responded, "Yeah, I already delivered to [U/I] that were there. They... they already finished 311." TAVERA and CC-1 then discussed their plan to meet the following day.

23. On or about March 31, 2019, the CNP intercepted TAVERA speaking to CC-2 regarding the planned cocaine transport. During this conversation, CC-2 told TAVERA that "...they're gathering, they just gathered the fruits... and we'll leave from here." As noted above, on April 2, 2019, when the CNP seized the DURAN DTO's shipment of cocaine, the cocaine was hidden under a shipment of fruit. Also during the conversation, TAVERA asked CC-2, "And how much... how much does that all add up to then?" CC-2 then replied, "They would be like 300, uh, 13." TAVERA then confirmed that CC-2 said 313. Based on my investigation of this case, and through discussing the investigation with CNP officers, I know that TAVERA and CC-1 were discussing the amount of cocaine in the shipment. As noted above, when law enforcement seized the DURAN DTO's shipment of cocaine, they recovered approximately 312 kilograms of cocaine. During the remainder of their conversation, TAVERA and CC-1 continued to discuss the amount of cocaine in the shipment.

24. On or about April 1, 2019, the day prior to the cocaine seizure, investigators intercepted DURAN and TAVERA speaking on the telephone. During the conversation, TAVERA asked DURAN, "...are you going to see that guy right away?" DURAN eventually replied, "I'm heading... there. ... When I'm close I'll... I'll call you... I'll call the dude to see... to see where he's at." When TAVERA told DURAN that "the guy hasn't arrived," DURAN replied, "Well, I'll call him either way, to see how things are." Based on my investigation of the case, and through discussing the investigation with CNP officers, it appears as though DURAN and TAVERA

discussed DURAN's intention to check on and meet one of their coconspirators in relation to the cocaine transport.

25. As discussed above, on April 2, 2019, the CNP seized the DURAN DTO's shipment of cocaine in Popayan. Early that morning, the CNP intercepted a call between TAVERA and CC-1. When TAVERA answered the phone, he said, "Hey, but what's up with you calling me at this hour?" CC-1 apologized and then said, "[CC-2's] wife called me, uh, to tell me they were caught, that they took them, dude." TAVERA responded, "Damn it. Where?" CC-1 replied, "They caught them in Popayan." CC-1 then said, "If you can come over here to the house to figure something out [U/I]... Come over here and... tell Tio for me because then he's not going to say that... You know that's why they called me, well, to see if he could do something." CC-1 said that a driver called and said, "[T]ell the boss for me that the [U/I] was caught and that we're in trouble with..." CC-1 said that the driver then hung up and turned off his (the driver's) phone. TAVERA asked if CC-2 was driving at the time, and CC-1 said that it was someone else. The CNP detained CC-2 driving in a car nearby the truck containing the DURAN DTO's cocaine and identified him. Later intercepted calls confirmed that the CNP detained CC-2 in relation to the cocaine seizure, but did not arrest him.

26. Shortly after CC-1's early morning call to TAVERA, the CNP intercepted another call between TAVERA and CC-1. During the call, TAVERA and CC-1 made plans to meet at a "bakery all the way downtown, the only one." TAVERA said, "[L]eave your phone.... I'm not going to have my phone."

27. Based on the judicially-authorized intercepted calls from April 2, 2019, as described above, the CNP learned that members of the DURAN DTO planned to meet that day at a bakery "all the way downtown, the only one." The CNP then established surveillance at that bakery and watched as three (3) men arrived. The CNP took pictures of the men. After the three men concluded their meeting, the CNP stopped and asked the men for their identification. The CNP identified

DURAN, CC-1 and an additional coconspirator who law enforcement believes is one of the DURAN DTO's "sources of supply" ("SOS"). Based on my training and experience, I know that a "source of supply" is the individual or organization who supplies drug traffickers with cocaine from their source laboratories. Based on law enforcement's investigation of this case, it is believed that the SOS has direct contact with the cocaine laboratories that manufacture the cocaine. It is believed that the SOS negotiates the price and arranges the initial transportation of the cocaine from the laboratory to CC-1. Through this in-person identification, and through reviewing the judicially-authorized wire intercepts discussed above, CNP investigators were able to determine which phone numbers the DURAN DTO members used through the planning and execution of the cocaine transport venture.

### Confidential Source Meeting with DURAN and TAVERA in August 2018

28. On or about August 18, 2018, a Confidential Source ("CS-1"), working under the DEA's direction, met with DURAN and some of DURAN's coconspirators, including TAVERA and Coconspirator 3 ("CC-3"), in Valledupar, Colombia. The DEA has paid CS-1 approximately $5,000 USD for his cooperation in this investigation and CS-1 is cooperating for money. CS-1 reported that DURAN had several armed bodyguards with him during the meeting. CS-1 covertly audio recorded this meeting.

29. During the meeting, DURAN and his coconspirators discussed numerous cocaine deals with individuals in Mexico and Europe (Spain, Portugal, Italy, Belgium, and the Netherlands). CC-3 told TAVERA that he (TAVERA) should work with him (CC-3) on these European deals. DURAN told CC-3 that he (DURAN) had deals in Maracaibo and Puerto Rico. DURAN and his coconspirators also discussed drug traffickers that they knew in common. DURAN asked CC-3 if he (CC-3) was going to get his cocaine from a particular source of supply. DURAN and his

coconspirators discussed how another drug trafficker had to pay taxes and protection money to a drug trafficker in control of an area. The group also discussed a lost load of cocaine.

30. DURAN then told CC-3 about a cocaine venture that he (DURAN) had with other coconspirators involving a submarine. DURAN told him that the owner of the "merchandise" has the "merchandise" stored on a boat because they could not keep it in storage. Based on my training and experience, and the context of the conversation, I know that the term "merchandise" refers to cocaine. DURAN told CC-3 that his (DURAN's) contact can organize a deal in eleven (11) days and can make a vessel a submarine or semi-submersible depending on what the client wants. They then discussed the freight prices they would need to pay for these services, the initial cost to start the business, and the range of price for the merchandise. DURAN told CC-3 that CC-3 would be able use frozen shrimp for the trip if he (CC-3) liked. Based on my training and experience, and the context of the conversation, I know that items such as frozen shrimp are commonly used by drug traffickers to disguise shipments of cocaine, and that drug traffickers often hide cocaine inside food shipments to evade law enforcement detection.

31. DURAN and CC-3 then discussed the prices involved in sending a shipment of cocaine from Venezuela to Europe, using Jamaica as a transshipment point. DURAN said that he was going to travel to Barranquilla, Colombia to discuss the transport with another unidentified coconspirator. DURAN and CC-3 then discussed another pending deal in Mexico. CC-3 asked DURAN how much to charge an unidentified coconspirator for the coconspirator's services. They discussed a smuggling route from Maracaibo to Guatemala and then another maritime route from Colombia to Jamaica to Mexico. Based on my training and experience, I know that when cocaine is transported north from South America to Guatemala and Mexico, based on the economic factors discussed above, and the fact that Guatemala and Mexico are transshipment countries, not consumption countries, that cocaine is destined to ultimately be illegally imported into the United

States. DURAN then discussed additional transports from South America to Europe, including a 120-kilogram load of cocaine sent from Caracas to an unidentified man in Rome.

32. During the meeting, DURAN received a video call from a man who law enforcement could not identify at the time ("M-1"). Law enforcement later identified M-1. M-1's portion of the call was not captured on CS-1's audio recording. CS-1 reported that DURAN spoke to M-1 about the time he (DURAN) spent in prison with him (M-1). TAVERA also spoke to M-1 and discussed people they knew in common. CS-1 reported that M-1 told DURAN that he (M-1) had recently been released from prison and was currently in New York, New York. M-1 stated that he was ready to start "working." Based on the context of the conversation and DURAN's prior relationship with M-1, CS-1 interpreted M-1's statement that he (M-1) was ready to start "working" to refer to trafficking cocaine.

33. On or about August 20, 2018, law enforcement spoke to M-1. M-1 was living in New York and was on supervised release at that time. M-1 confirmed that he spoke to DURAN two days prior (on or about August 18, 2018). M-1 confirmed that DURAN is a Colombian national and that they (he and DURAN) were previously incarcerated together. M-1 said that a mutual friend (another convicted felon) told him that DURAN had been asking about him (M-1), and that the mutual friend then called DURAN and put M-1 on the phone with DURAN.

34. After the meeting described above, CS-1 reviewed DURAN's Colombian cedula photograph and confirmed that the individual in the cedula photograph is the same individual he (CS-1) met with on or about August 18, 2018. CS-1 also confirmed that TAVERA participated in the meeting.

35. After the meeting described above, CNP officers reviewed the audio recording CS-1 made of his August 2018 meeting with DURAN, TAVERA, and CC-3. These CNP officers were familiar with DURAN's voice through previously monitoring DURAN, TAVERA, CC-1, and some

their other coconspirators' phone calls during the judicially-authorized wire intercept investigation into the DURAN DTO described above (which led to the seizure of approximately 312 kilograms of cocaine on or about April 2, 2019). The CNP officers positively identified DURAN and TAVERA's voices on CS-1's audio recording from the August 18, 2018 meeting.

### Conclusion

36. Based on the facts and information set forth in this affidavit, your affiant submits that there is probable cause to believe that defendants DURAN and TAVERA did knowingly and willfully combine, conspire, confederate, and agree with each other and other persons known and unknown, to distribute a controlled substance in Schedule II, intending, knowing, and having reasonable cause to believe that such controlled substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959(a), all in violation of Title 21, United States Code, Section 963, and that the controlled substance involved in the conspiracy attributable to them as a result of their own conduct, and the conduct of other conspirators reasonably foreseeable to them, is five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(B).

**FURTHER YOUR AFFIANT SAYETH NAUGHT**

_[signature]_ 08/13/20
ROBERT W. LUKENS, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Attested to by the Applicant in accordance with
the requirements of Fed.R.Crim.P. 4.1
by FaceTime this 13th day of August 2020.

_[signature]_
HONORABLE CHRIS M. McALILEY
UNITED STATES MAGISTRATE JUDGE

15

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: __20-mj-3370__

### BOND RECOMMENDATION

DEFENDANT: __EDUIN SAMUEL DURAN COLINA__

__PTD__
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: *Joseph M. Schuster*
AUSA:   Joseph M. Schuster

Last Known Address: _____

What Facility: _____

Agent(s):   __ROBERT W. LUKENS, DEA__
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: __20-mj-3370__

### BOND RECOMMENDATION

DEFENDANT: __CLAUDIO FRANCISCO TAVERA ESPINAL__

__PTD__
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: *Joseph M. Schuster*
AUSA:   Joseph M. Schuster

Last Known Address: _____

What Facility: _____

Agent(s):   __ROBERT W. LUKENS, DEA__
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)